PAUL E. BANG v. INTERNATIONAL SISAL COMPANY.[1]

No. 33,010.

February 27, 1942.

*Fowler, Youngquist, Furber, Taney & Johnson* and *Ralph H. Comaford,* for appellant.

*Stinchfield, Mackall, Crounse & Moore* and *Leslie L. Anderson,* for respondent.

HILTON, JUSTICE.

Action for breach of an employment contract in which, after favorable findings for plaintiff, the employer appeals from the judgment, contending that the evidence compels the view that the employe was discharged for cause. This represents the principal controversy between the parties, but in the view we take of the case collateral questions require solution.

Plaintiff was employed as sales and good-will representative by defendant for one year commencing November 1, 1939, at a monthly salary of $150 and traveling expenses. Under their contract, plaintiff was to follow defendant's instructions at all times and to devote his entire time to the business. It is contended that while working in Winona during the second week in January 1940 plaintiff so disobeyed instructions that defendant justifiably discharged him.

After being employed, plaintiff was first sent to Milwaukee, where he called upon jobbers and users of sweeping compounds manufactured by defendant. After a month, he returned to Minneapolis, where he continued the promotion, demonstration, and

distribution of compounds locally. Preliminary to going to Winona, plaintiff and Griffith, a newly employed salesman, received instructions from Mr. Bradshaw, president of defendant. Before the trial, Mr. Bradshaw died, and the content of his instructions was brought out through the testimony of Mrs. Priebe, office manager of defendant. According to these instructions, each salesman was assigned a jobber upon whom he was to call immediately after arrival. He was to request the names of about 25 prospective users, who, in addition to present users, were to be contacted. The other prospective jobbers were to be divided between them. This witness stated that the salesmen were instructed to work independently of each other and not to make calls with the jobbers' salesmen. User orders obtained were to be held until the canvass was completed and then delivered to the respective jobbers to be filled. A pool car was to be made up for all orders and consigned to Winona. Each salesman stated that he understood the instructions and would comply therewith.

Upon arriving in Winona on Monday, January 8, 1940, plaintiff went immediately to the jobber assigned to him, Latch & Son, the only jobber then handling defendant's merchandise, and requested the list of names. These were unavailable, and the buyer suggested that plaintiff meet with the Latch salesmen at noon. This done, the plaintiff and Griffith together contacted other jobbers during the afternoon. Next day, they made a demonstration at the high school and used the remainder of the afternoon and evening contacting members of the school board. All of Wednesday and Thursday morning plaintiff spent in the company of a Latch salesman, meeting various users. Thursday afternoon and evening plaintiff was alone in contacting users. Friday morning again found plaintiff with a Latch salesman, and then in the afternoon he was alone, seeing users. That evening plaintiff delivered a lecture to the Latch salesmen at which Griffith was present. Saturday morning plaintiff met with a Latch salesman, contacted the buyer, and in the afternoon, in response to instructions from Bradshaw, returned to Minneapolis. No pool car was arranged.

All user orders obtained were given to Latch. On Monday of the following week plaintiff was given notice of discharge effective February 1, 1940.

As evidence of disobedience, defendant relies not only upon a contract of what plaintiff did in Winona with what he was supposed to do, but also upon letters written by plaintiff after returning from Winona. In these plaintiff acknowledged that he had "made a mess of things in Winona"; disobedience in several particulars was confessed, and plaintiff enumerated the practices which he would eliminate if he were again to canvass Winona, including the practice of making calls with the jobbers' salesmen and not working his share of the town alone. Disobedience is also claimed in that, after receiving notice of discharge and at a time when he was instructed to remain in the Twin Cities, plaintiff went again to Winona for the purpose of securing "verification of the fact that I had actually accomplished something for the International Sisal Company while in their employment."

It is undeniable that defendant presents a strong case for justifiable discharge. But in order for us to interfere, we must say that the evidence to the contrary was manifestly and palpably overcome by defendant's proof. 1 Dunnell, Dig. & Supp. § 411. Certainly, there is no evidence of such disobedience as manifests insubordination or perversity toward the employer. Von Heyne v. Tompkins, 89 Minn. 77, 93 N. W. 901; 5 L.R.A.(N.S.) 524. However, we are not willing to say that only where the evidence discloses this type of misconduct can there be justifiable discharge. Under the law, an employe is required to obey all reasonable orders of the employer. Von Heyne v. Tompkins, *supra*, p. 81; 4 Williston, Contracts (Rev. ed.) § 1018. Defendant urges that the instruction not to make calls with the jobbers' salesmen was the result of past experience and certainly reasonable, as were all other instructions.

The privilege of discharge has been said to exist in those cases where there has been a material breach of the employment contract, and "wilful disobedience" is recognized as such a breach.

Restatement, Agency, § 409. Defendant so classifies the disobedience of plaintiff. Taken without explanation, the letters written by plaintiff after receiving notice of discharge lend persuasive weight to the view that plaintiff intentionally disobeyed known instructions. May v. New York M. P. Corp. 45 Cal. App. 396, 404, 187 P. 785, 788. However, on the stand plaintiff denied that these letters could be taken as conclusive of the facts. "To me I hadn't disobeyed an order; but in order to satisfy Mr. Bradshaw, * * * I thought I would acknowledge" the errors and disobedience as a technique for holding the job. In response to the suggestion by defendant's counsel that "you were giving Mr. Bradshaw some salve," plaintiff replied, "Yes, I agree with you. * * * Just as much as anyone else would do to hold his job." Thereupon, he denied disobedience, or having made a mess of things, or that there had been a lack of coöperation between himself and Mr. Griffith, as charged by Mr. Bradshaw in a letter written to Winona.

The trial judge saw fit on the evidence to believe that plaintiff had exercised his best judgment in light of what he believed the instructions to be, and only when he discovered the displeasure of his employer did he undertake to regain favor and hold his employment by acting the part of a humble, contrite, repentant employe. He thus found himself unable to hold that plaintiff was properly discharged. So, too, do we see the case. Plaintiff was being trained as a salesman, and prior to Winona his development had commanded the written approbation of his superiors. We do not believe this is a case where a narrow, restricted, definite instruction, neither equivocal nor having doubtful application, has been disobeyed. Certainly plaintiff did not understand that his employer had withdrawn all discretion and excluded any exercise of judgment in an adjustment to the circumstances. Plaintiff was unable to comply with the instruction to obtain a list of names from Latch. Instead, he was asked by the Latch buyer to meet with the salesmen, evidently to get the user information from them. Since Latch was the only jobber outlet which defendant had in Winona, plaintiff, fearful of defendant's interests, may

have been afraid to ignore the request and refuse to accompany them. His explanation of the reasons for the contents of his letters was not so unrealistic in light of human experience as to require rejection by the trial judge. Griffith, being a new salesman, naturally would look to plaintiff for advice and assistance, which plaintiff might not feel wholly justified in refusing. Certainly no showing was made that enough orders were taken to necessitate a pool car or that jobbers other than Latch & Son were obtained with whom the user orders could have been placed. It is also to be remembered that plaintiff was being trained, and merited tolerance from the employer commensurate with his experience.

Furthermore, the witness who made known the contents of the instructions was contradicted at one point. According to her testimony, plaintiff received the instructions as to the pool car and division of orders at the time of the conference prior to going to Winona, while in a letter written to plaintiff in Winona, Bradshaw stated that he had omitted to discuss this phase with plaintiff. Considering the inability of plaintiff otherwise to contradict this witness's version of the instructions, this might, together with her conduct as a witness, have been enough to justify a doubt. Certainly had the instruction not to associate with the jobbers' salesmen been definitely understood as effective for all occasions and under all circumstances, it is difficult for us to believe that plaintiff, seemingly a serious, hard-working, well-meaning employe, would have intentionally disobeyed it. Although plaintiff may have given what instructions he received an overly liberal construction, and though he may have shown too much inclination to adjust to the circumstances, we cannot say that the evidence proves, in such degree as would merit our interference, that plaintiff so departed from the performance of his contract as to justify his discharge. Obviously, there could be no estoppel from the letters of plaintiff to deny that he had been properly discharged. Charges of incompetence fail of proof. The trip taken one Sunday by plaintiff to Winona after having received

notice of discharge was neither the cause of nor the basis for the discharge.

Defendant opposes plaintiff's recovery upon several narrow grounds. It is asserted that plaintiff failed to accept employment upon a straight commission basis and thereby omitted to respond to an opportunity to mitigate his damages. Indubitably, the record establishes that plaintiff made repeated attempts to secure employment and that he had several offers of commission sales work, mostly in unrelated lines, which he refused because of the belief that he would be unable to make a living working on this basis. We pass the point whether mitigation of damages must always be pleaded and set up by defendant (it was not here) where the evidence relating to plaintiff's efforts to secure employment is first brought out by plaintiff on direct and developed by defendant on cross-examination. Bennett v. Morton, 46 Minn. 113, 114, 48 N. W. 678; cf. McClelland v. Climax Hosiery Mills, 252 N. Y. 347, 358, 360, 169 N. E. 605. Yet we are unwilling to say that plaintiff's failure to accept straight commission selling should have operated to mitigate his damages. It was mostly employment in business lines for which he had no special experience and under a radically different compensation, scheme. A wrongfully discharged salesman ought not to be required to accept employment compelling self-financing and offering no certainty of reward under penalty of losing that, or part of that, to which he is entitled under a contract having a salary inducement.

Nor can funds received by plaintiff during the contract year from the state unemployment compensation fund (Mason St. 1940 Supp. § 4337-21, et seq.) on account of his unemployment be regarded as compensation received from other employment so as to be deductible in mitigation of damages. The benefits received were intended to alleviate the distress of unemployment (§ 4337-21), not to diminish the amount which an employer must pay as damages in making whole a wrongfully discharged employe.

As consequence of the breach of contract, plaintiff has suffered a full loss of the salary ($1,350) which he would have earned dur-

142

ing the contract year unmitigated by any amounts earned in other employments. The trial court allowed interest thereon from the date of breach. According to the established rule of damages, there being no dispute over the correctness of the principal sum, this allowance was proper. 25 C. J. S., Damages, § 92; Hollwedel v. Duffy-Mott Co. Inc. 263 N. Y. 95, 188 N. E. 266, 90 A. L. R. 1312; Grand Forks Lbr. Co. v. McClure Logging Co. 103 Minn. 471, 115 N. W. 406.

Judgment affirmed.

### ON APPLICATION FOR REARGUMENT.

On March 26, 1942, the following opinion was filed:

PER CURIAM.

Our affirmance of the trial court's allowance of interest from the date of breach is challenged in the petition for reargument. The propriety of this allowance was never questioned in the court below and may not be questioned here. Andrews v. Andrews, 170 Minn. 175, 189, 212 N. W. 408, 213 N. W. 899, 51 A. L. R. 542.